BARNES, J.,
for the Court:
¶ 1. Brett Anthony Shaw was convicted by a jury in the Rankin County Circuit Court of Count I, aggravated assault, and Count II, felony malicious mischief. He was sentenced to twenty years for Count I, *82 with ten years suspended, and five years for Count II, followed by five years of supervised probation, all in the custody of the Mississippi Department of Corrections (MDOC). Shaw filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The motion was denied. Aggrieved, Shaw appeals. Finding no reversible error, we affirm Shaw’s convictions.
FACTS AND PROCEDURAL HISTORY
¶ 2. On July 18, 2010, Shaw, Alex Gill, Shaun Killingsworth, and Steven Dortch were among a number of people attending a party at the apartment of Hannah Hard-wick in Richland, Mississippi. Another party was also being held upstairs in the same building at the apartment of Ian Elward. Both parties involved alcohol.
¶ 3. At one point during Hardwick’s party, Shaw, Gill, and Killingsworth were outside her apartment when Gill threw an empty beer bottle in some nearby bushes. Killingsworth told him to pick up the bottle. Shaw informed Killingsworth that Gill was only seventeen years old and asked Killingsworth to leave Gill alone. Later, in Hardwick’s kitchen, a verbal altercation ensued between Shaw and Killingsworth when Shaw held up his empty beer bottle in a threatening manner. With the situation becoming confrontational, the two men were separated by Dortch and Skylar Slay, another person at the party; Shaw was then escorted from the party by Dortch.
¶ 4. Shortly after, Hunter Elward and Trevor Bell, two people attending the party at Ian’s apartment, came to Hardwick’s apartment and told Killingsworth that Shaw was jumping up and down on the hood of Killingsworth’s car. Killingsworth went outside to confront Shaw, who was still in the parking lot, standing behind the car. Angry and shouting, Shaw approached Killingsworth, who informed Shaw that he did not want to fight. As Shaw continued to yell and beat his chest, Killingsworth pushed Shaw, grabbed him, and pinned him against another car in the parking lot. Gill, who was standing nearby, demanded that Killingsworth release Shaw and proceeded to attack Killings-worth from behind. Killingsworth, keeping his hold on Shaw, turned to see who was striking him. When Killingsworth twisted back around, Shaw bit his ear.
¶ 5. With Shaw still restrained by Kill-ingsworth, the two men fell to the ground and struggled in the grass. Lieutenant David East of the Richland Police Department arrived on the scene and ordered the men to separate. Both men yielded and were handcuffed. Killingsworth was bleeding from his ear, and Lieutenant East called an ambulance to transport him to the hospital. It was later discovered that Killingsworth had lost a portion of his right ear. Shaw was uninjured.
¶ 6. Subsequently, Shaw was arrested and charged with aggravated assault, for biting off a portion of Killingsworth’s ear, and with malicious mischief, for damaging Killingsworth’s car. A trial took place on June 19-22, 2011. At the close of the trial, the jury returned a guilty verdict on both counts. Shaw was sentenced to twenty years, with ten years suspended, for the charge of aggravated assault, and five years, for the charge of malicious mischief, with the sentences to run concurrently, all to be served in the custody of the MDOC. He was also ordered to served five years of supervised probation. Shaw filed a motion for a JNOV, or in the alternative, a new trial, which was denied.
¶ 7. Shaw now appeals, arguing: (1) the trial court erred by denying his motion for a directed verdict and his motion for a JNOV, or in the alternative, a new trial *83 because the evidence was insufficient to support the convictions of aggravated assault and malicious mischief and the jury’s verdict regarding aggravated assault was against the overwhelming weight of the evidence because he was acting in self-defense; (2) the trial court erred by allowing the State to call witnesses, including expert witnesses, in violation of discovery rules; (3) the prosecutor misconstrued the evidence and prejudiced the jury; (4) a mistrial should have been granted based on juror misconduct and an improper line of questioning; (5) teeth are not a mechanism likely to produce death or serious bodily harm; (6) the trial court erred in denying two “words of provocation” jury instructions; and (7) the cumulative errors warrant reversal.[1]
¶ 8. Finding no error, we affirm the judgment.
DISCUSSION
I. Whether the trial court erred in denying Shaw’s motion for a JNOV, or in the alternative, a new trial.
¶ 9. Shaw contends that the trial court erred in denying his motion for a JNOV, or in the alternative, a new trial. A motion for a JNOV challenges the sufficiency of the evidence. See Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (citing Carr v. State, 208 So.2d 886, 889 (Miss. 1968)). In order for the evidence to be found sufficient to sustain a conviction, the evidence must show “beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.” Id. This Court will reverse a conviction if the evidence “point[s] in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty.” Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss. 1985)).
¶ 10. A motion for a new trial challenges the weight of the evidence. Minor v. State, 89 So.3d 710, 716 (¶ 20) (Miss.Ct.App.2012). Viewing the evidence “in the light most favorable to the verdict,” a new trial will only be ordered “where ‘the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction unconscionable injustice.’ ” Id. (citations omitted).
A. Aggravated Assault
¶ 11. Mississippi Code Annotated section 97-3-7(2)(b) (Rev.2006) provides that “[a] person is guilty of aggravated assault if he ... attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]” Shaw was charged with purposely or knowingly “biting a portion of Kill-ingsworth’s right ear off, a means likely to produce death or serious bodily harm.” The State was required to prove, beyond a reasonable doubt, that Shaw acted with either requisite mental state provided for in section 97-3-7(2)(b).
¶ 12. Shaw argues that the State did not put forth any evidence to support the “purposely or knowingly” elements of the charge of aggravated assault. Shaw asserts that it is reasonable that Shaw bit Killingsworth in an attempt to get Kill-ingsworth to release him and not to cause bodily injury. As such, Shaw argues that *84 since he acted in self-defense without the intent to cause serious bodily harm, the evidence was insufficient to sustain his conviction of aggravated assault. We disagree, finding that the evidence was sufficient for the jury to conclude that Shaw intended to inflict serious bodily harm on Killingsworth.
¶ 13. As the State observes, Shaw’s intent to cause serious bodily injury can be inferred from testimony given regarding Shaw’s anger and antagonizing behavior towards Killingsworth. “Intent ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them.” Wales v. State, 73 So.3d 1113, 1121 (¶ 22) (Miss.2011) (citation omitted). Even if intent is not expressly evident, it may be proven “by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident.” Johnson v. State, 44 So.3d 400, 408 (¶ 24) (Miss.Ct.App.2010) (quoting Boyd v. State, 977 So.2d 329, 335 (¶ 23) (Miss.2008)). Whether a person intended to commit an act is “a question of fact to be gleaned by the jury from the facts shown in the ease.” Id. “The presumption of the law is that each person intends the natural consequences of his actions.” Staten v. State, 813 So.2d 775, 777 (¶ 8) (Miss.Ct.App.2002) (citing Hydrick v. State, 246 Miss. 448, 450—451, 150 So.2d 423, 424 (1963)). “The State must be given the benefit of all reasonable inferences that may be drawn from the evidence.” McBride v. State, 78 So.3d 359, 361 (¶ 7) (Miss.Ct.App.2011) (citing Christian v. State, 859 So.2d 1068, 1071 (¶ 12) (Miss.Ct.App.2003)). “[E]ven ‘slim’ evidence can be used to uphold a guilty verdict so long as it can reasonably be inferred to support such a finding.” Sanders v. State, 949 So.2d 92, 95 (¶ 5) (Miss.Ct.App.2006) (citation omitted).
¶ 14. Brooke Patterson, Shaw’s ex-girlfriend, testified that when the couple initially approached the party, he told her that “he was probably going to end up getting in a fight with this douchebag [ (referring to Killingsworth) ] before the night was over.” Later that evening, Shaw behaved in a threatening manner toward Killingsworth and had to be forcibly removed from the apartment to avoid further conflict. Witnesses stated it was at that point Shaw kicked and jumped on Killings-worth’s car.
¶ 15. Admittedly, both men had been arguing all evening. But, when Killings-worth confronted Shaw about damaging his car, he repeatedly told Shaw that he did not want to fight. Witnesses testified that during this confrontation, Shaw was “antagonizing” Killingsworth and beating his own chest, saying things like “Come on” and “Do something.” Killingsworth, upon this taunting, did initiate contact with Shaw by shoving him and then wrapping his arms around Shaw in an attempt to restrain him and to prevent Shaw from hitting him. However, while he was holding Shaw’s arms, Gill began hitting Kill-ingsworth on the head in an attempt to make Killingsworth let Shaw go. When Killingsworth turned his head to look at Gill, Shaw took advantage of his inattention to retaliate and bite off part of Kill-ingsworth’ s ear. Thus, the fight was essentially two against one. In fact, one witness stated Gill was swinging away so wildly that he almost hit a female bystander. Even after the fight was broken up by police, Shaw continued to be verbally belligerent and uncooperative, saying “F*ck you” to the arresting officer. Killings-worth, on the other hand, was cooperative and quiet.
¶ 16. The determination of Shaw’s intent and whether he was acting in self-defense was a question of fact to be *85 decided by the jury. See Franklin v. State, 72 So.3d 1129, 1136 (¶ 29) (Miss.Ct.App.2011) (“[T]he question of whether a defendant acted in self-defense or in defense of others is a question for the jury to resolve.”) (citing White v. State, 976 So.2d 415, 420 (¶ 23) (Miss.Ct.App.2008)).
To make an assault justifiable on grounds of self-defense, danger to the defendant must be either actual, present and urgent, or [the] defendant must have reasonable grounds to apprehend design on the part of the victim to kill, or to do him some great bodily harm, and, in addition, there must be imminent danger of such design being accomplished.
Anderson v. State, 571 So.2d 961, 963 (Miss.1990) (citations omitted). It is apparent from the verdict the jury members determined that Shaw was not acting in self-defense and had the intent to seriously injure Killingsworth. We find there to be sufficient evidence to support this conclusion.
¶ 17. Giving the State all reasonable inferences that may be drawn from the evidence, we find the evidence is sufficient to support the verdict. We also conclude that the verdict was not contrary to the overwhelming weight of the evidence and does not sanction an unconscionable injustice.
B. Malicious Mischief
¶ 18. Shaw also argues that the evidence was insufficient to support his conviction of malicious mischief. Although Shaw argues that the jury’s verdict is against the weight of the evidence, we find that his arguments actually only address the sufficiency of the evidence. As noted previously, evidence will be deemed sufficient where it shows, beyond a reasonable doubt, that the accused committed the act and every element of the offense existed. Bush, 895 So.2d at 843 (¶ 16).
¶ 19. Shaw was convicted under Mississippi Code Annotated section 97-17-67 (Supp.2012), which provides in pertinent parts:
(1) Every person who shall maliciously or mischievously destroy, disfigure, or injure, or cause to be destroyed, disfigured, or injured, any property of another, either real or personal, shall be guilty of malicious mischief.
[[Image here]]
(3) If the value of the property destroyed, disfigured or injured is in excess of Five Hundred Dollars ($500.00), it shall be a felony punishable by a fine not exceeding Ten Thousand Dollars ($10,000.00) or imprisonment in the Penitentiary not exceeding five (5) years, or both.
Shaw contends the evidence was insufficient because the State failed to prove that he willfully damaged Killingsworth’s ear in excess of $500. We disagree.
¶ 20. Several people witnessed Shaw kicking and jumping on Killingsworth’s car. Dortch testified that after the kitchen altercation, he escorted Shaw out of Hardwick’s apartment. The two men walked in the direction of Shaw’s apartment, passing Killingsworth’s car on the way. Dortch stated that Shaw went about five meters past Killingsworth’s car, when he abruptly turned around, jumped on the hood of the car, and kicked the fender. Hunter, who was watching the incident from Ian’s balcony, corroborated this testimony. It is evident that Shaw’s actions were willful and malicious.
¶ 21. Shaw argues that damage was present on Killingsworth’s car at least four hours prior to the altercation. ■ He contends that the hood and the fender already had several dents and scratches. Al *86 though there was testimony that Killings-worth’s car had minor damage prior to the altercation, the record reflects that Shaw caused further damage. The State presented several pictures of Killingsworth’s car taken thirty-six hours after the altercation. The pictures show two distinct footprints and indentations in the places where Dortch and Hunter testified that Shaw had jumped on and kicked the car. Further, Detective Lee Drake with the Richland Police Department testified that Shaw’s statements about what happened that night “coincided with the damages done to the vehicle.”
¶ 22. Shaw asserts that since the State never placed a value on the car, the State failed to prove the car was worth more than $500. Mark Thomison, an estimator for Barnett’s Body Shop in Ridgeland, Mississippi, testified as an expert witness for the State regarding the cost of damage done to Killingsworth’s car. Thomison stated that the total cost to fix the two dents made in Killingsworth’s car that night would be $729.12.
¶ 23. We conclude there was sufficient evidence to support Shaw’s malicious mischief conviction. The evidence shows that Shaw, after getting in a heated verbal argument with Killingsworth, malevolently jumped on and kicked Killingsworth’s car, causing damage in excess of $500. This issue is without merit.
II. Whether the State committed discovery violations by failing to provide Shaw with proper notice of its witnesses.
¶ 24. Shaw argues that “the trial court violated [his] right to a fair trial by allowing the State to call witnesses without oral summation of their testimony and without complying with Rule 9.04” of the Uniform Rules of Circuit and County Court. Rule 9.04 “requires the prosecution to disclose the names and addresses of all witnesses in chief, and any recorded statements made by the defendant and/or witness, proposed to be offered by the prosecution at trial.” Harris v. State, 37 So.3d 1237, 1241 (¶ 17) (Miss.Ct.App.2010) (citing URCCC 9.04(A)(1)). The guidelines from Rule 9.04 “were intended to prevent ‘ambush’ or unfair surprise at trial by either party.” Ben v. State, 95 So.3d 1236, 1249 (¶ 36) (Miss.2012) (citing Harrison v. State, 635 So.2d 894, 898 (Miss.1994)). Shaw specifically claims that the State failed to properly designate Dr. Michael Angel and Thomison as expert witnesses and, thus, failed to provide the defense notice of their testimony prior to trial. Shaw argues that he was not provided a curriculum vitae, that there was no voir dire of Dr. Angel, and that the defense was not provided an opportunity to interview either witness, leaving him to speculate as to the substance of their testimony.
¶ 25. After Killingsworth testified, defense counsel moved to exclude all other witnesses by the State, arguing that he had not received notice of the testimony because the State failed to provide a witness list. Counsel did admit, however, that he had received discovery documents that contained those witnesses’ signatures.
MR. RAINER: We as defense lawyers have to depend on the Court to make it an even playing field. We ask that all — any—any other witness be excluded for failure to properly identify prior to trial.
THE COURT: Mr. Rainer, let me see that I understand. So you’re saying that the even playing field would be at 4:00 o’clock on the day of trial for you to stand up and say that you have received no witnesses; therefore, the State can’t put on any witnesses, that is an even playing-field?
*87 The trial court went on to note that defense counsel failed to mention any issues with witnesses during a prior meeting regarding the pretrial checklist. Citing this Court’s holding in Murray v. State, 20 So.3d 739 (Miss.Ct.App.2009), the trial judge determined the State had sufficiently identified the testifying witnesses through the discovery documents provided to the defense. In Murray, the trial court ruled that the substance of a witness’s testimony had been provided to the defense through a police report. Id. at 743 (¶ 12). “Although the police report did not go into the specific details of [the witness’s] testimony, this was sufficient to put the defense on notice as to [the witness’s] testimony.” Id.
¶26. We agree with the trial court’s ruling that defense counsel had received notification through the State’s discovery documents regarding witnesses and their respective testimony. Dr. Angel’s testimony was related to his treatment of Killings-worth’s ear, and his signed medical reports had been properly furnished to defense counsel. Additionally, Thomison, a body shop appraiser, testified as to his estimate and to the damage done to Killingsworth’s car. His report/estimate had also been provided to Shaw. Thus, the calling of these witnesses did not subject Shaw’s defense to “ambush” or “unfair surprise.”
¶ 27. Regarding the designation of the expert witnesses, while the State was questioning Dr. Angel regarding his qualifications, defense counsel interrupted, stating that he would accept Dr. Angel as an expert in the field of plastic and reconstructive surgery. After the State tendered Thomison as an expert, the defense still objected as to his expert designation, but did not conduct any voir dire. Furthermore, defense counsel admitted that he had been provided both witnesses’ reports before trial. Thus, the substance of their testimony was available to the defense. The trial judge held regarding Thomison’s testimony:
And for Mr. Thomison, you had a copy from the State. You had a copy of his report. And under the case that I read to you [ (Murray),] like it or not, that’s what the case said, that was sufficient ... to put you on notice.
[[Image here]]
It put you on notice that he might be called as a witness and that these are the things that he says.... You either want to interview them or you don’t want to interview them. You make that choice[,] and you make that option.
We also cannot see how Dr. Angel’s testimony was a surprise to defense counsel. As already noted, the medical reports had been provided during discovery to defense counsel. Shaw was sufficiently put on notice as to these witnesses’ testimony.
¶ 28. Therefore, we find that there was no violation of Rule 9.04 and that the trial court did not err in allowing these witnesses to testify.
III. Whether the prosecutor misconstrued the evidence and prejudiced the jury.
¶ 29. Shaw contends that throughout the course of the trial, the State constantly mischaracterized the evidence and prejudiced the jury. However, Shaw cites no legal authority to support his argument. A defendant’s failure to cite relevant authority to support his argument “obviates the appellate court’s obligation to review such issues.” Gillett v. State, 56 So.3d 469, 517 (¶ 142) (Miss.2010) (citation omitted) (quoting Simmons v. State, 805 So.2d 452, 487 (¶ 90) (Miss. 2001)). Therefore, this issue is procedurally barred from consideration. Id.
*88 ¶ 30. Notwithstanding this procedural bar, in those instances where the defense contemporaneously objected to the State’s line of questioning or statements, we find no testimony or questioning that resulted in prejudice to Shaw.[2] During the prosecution’s questioning of Dortch, Shaw’s friends were referred to by Dortch and the State as a “posse.” Upon the defense’s objection, the trial judge noted that Dortch was the one who originally used the term, but he instructed the jury to disregard the use of the term. Later, when the State questioned Dortch regarding whether Shaw was a truthful person and Dortch responded negatively, the trial judge again sustained the defense’s objection but overruled its motion for a mistrial. The judge instructed the jury:
The last question that was asked by the State of this witness was: “Do you consider the Defendant to be a truthful person?” There was an objection raised and I sustained that objection, and I’m specifically again instructing you that you are to disregard that question and answer because under the Rules of Evidence and Proceduref,] it’s inappropriate at this time. So I will ask you that you follow the instruction of the Court and disregard the question and answer in that regard. Can all of you follow that instruction?
(Jurors indicate affirmatively.)
“When a judge sustains an objection, the remedial acts of the court are usually deemed sufficient to remove any prejudicial effect from the minds of jurors.” Catchings v. State, 39 So.3d 943, 949 (¶ 22) (Miss.Ct.App.2009) (citing Vickery v. State, 535 So.2d 1371, 1380 (Miss.1988)). The jury is presumed to follow the instructions of the court. Id. Thus, we conclude that these instances did not warrant the granting of a mistrial by the trial court.
¶ 31. Shaw also claims that the State should not have been allowed to question Gill regarding portions of a prior inconsistent statement, but as we have already noted, he provides no authority as to why this questioning would be considered pros-ecutorial misconduct.
¶ 32. Therefore, we find no merit to this claim by Shaw.
IV. Whether a mistrial should have been granted based on juror misconduct and an improper line of questioning.
¶ 33. Shaw argues that juror misconduct warranted the granting of a mistrial by the trial court. Again, Shaw fails to cite any authority, proeedurally barring the issue from consideration. Regardless, we find nothing to support his claim. During the trial, it came to the court’s attention that one of the jurors had contacted a witness, Patterson, on Facebook. Evidently, the juror, Blake Smallwood, had been a janitor at the school that Patterson had attended. Smallwood knew a couple of the other witnesses as well. Smallwood also made a comment on his Facebook page regarding his jury duty, stating: “I guess all I need to know is GUILTY, lol.”
¶ 34. Our supreme court has held:
In order for the duty to investigate [for juror misconduct] to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality. Juror polling shall only be permitted by an attorney, outside the supervision of the court, upon written request.
*89 At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information.
Moore v. State, 52 So.3d 389, 343 (¶ 14) (Miss.2010) (quoting Gladney v. Clarksdale Beverage Co., 625 So.2d 407, 418-19 (Miss.1993)). The trial judge thoroughly questioned Smallwood regarding his conduct and promptly removed him from the jury. The remaining jurors were polled by the trial judge; all stated that Smallwood had not made any positive or negative statements regarding the witnesses or defendants that would have tainted the jury and that they could be fair and impartial. Therefore, nothing in the evidence supports Shaw’s argument that the jury was subject to any improper outside influence or that the remaining jury was prejudiced by Smallwood in any way.
¶ 35. Shaw also revisits his argument regarding the State’s questioning of Dortch regarding Shaw’s character for truthfulness, claiming that the improper line of questioning should have warranted a mistrial. As we have already held, since the trial court instructed the jury to disregard the question and resulting answer, there was no prejudice suffered by Shaw as a result.
¶ 36. Consequently, we find no error in the trial court’s refusal to grant a mistrial.'
V. Whether teeth are a mechanism likely to produce death or serious bodily harm.
¶ 37. Shaw also “questions whether teeth are ‘a mechanism likely to produce death or seriously bodily harm,’ ” under section 97—3—7(2)(b), as stated in the jury instructions. In Jackson v. State, 594 So.2d 20 (Miss.1992), the supreme court found that the evidence of a beating by fists was sufficient to sustain a charge for aggravated assault.
[W]hether or not hands and closed fists constitute, under [section] 97-3-7(2)(b), a “means likely to produce serious bodily harm” involves a question of fact to be decided by the jury in light of the evidence. The responsibility for determining likelihood remains with the jury which may be left free to give due weight to the characteristics of the parties, the place, the manner in which hands and fists are used, and the degree of force employed.
Id. at 24 (emphasis added).
¶ 38. As to the use of teeth, the District of Columbia Court of Appeals has found that “human teeth may, as a matter of law, be a ‘deadly or dangerous weapon[.]’ ” In re D.T., 977 A.2d 346, 355 (D.C.2009). “Whether an object or material which is not specifically designed as a dangerous weapon is a ‘dangerous weapon’ under an aggravated assault statute is ordinarily a question of fact to be determined by all of the circumstances surrounding the assault.” Id. at 349 (citation omitted). In that case, law enforcement was attempting to subdue the defendant, and the defendant bit the officer in the groin area. The officer required months of antiviral treatment as a result of the injury. Id. at 356. Consequently, the appellate court held that a rational trier of fact could conclude that the defendant “used his teeth in a manner likely to cause great bodily harm.” Id. at 357.
¶ 39. Similarly, in Sizemore v. State, 387 S.W.3d 824, 826-30 (Tex.App.2012), the Texas Court of Appeals concluded that damage caused by an ear bite was sufficient to warrant a conviction for aggravated assault, as the evidence was sufficient to establish that the victim suffered “serious bodily injury.”
*90 ¶ 40. Some jurisdictions have ruled that teeth are not considered to be a “deadly” or “dangerous” weapon. See State v. Kuperus, 241 Or.App. 605, 251 P.3d 235, 238-39 (2011) (Defendant’s teeth are not considered a “dangerous” or “deadly” weapon for the purposes of assault.); Commonwealth v. Davis, 10 Mass.App.Ct. 190, 406 N.E.2d 417, 420 (1980) (human body parts not considered dangerous weapons). However, we find these cases distinguishable. Unlike the Mississippi aggravated-assault statute, their statutes require serious bodily injury to have occurred by means of a “deadly weapon” or a “dangerous weapon.” See Kuperus, 251 P.3d at 237 (The crime of assault in the first degree is committed when the person “[i]n-tentionally causes serious physical injury to another by means of a deadly or dangerous weapon.”) (Quoting O.R.S. § 163.185(1)(a)); Davis, 406 N.E.2d at 419 (“Section 15A punishes assaults and batteries committed by ‘means of a dangerous weapon.’ ”) (citing Mass. Gen. Laws ch. 265, § 15A). As our supreme court noted in Jackson:
It is not necessary under [section] 97-3-7(2)(b) that the use of hands and fists constitute the use of a “deadly weapon”; rather, it is enough if their use constitutes a “means likely to produce either death or serious bodily harm.” Nor is it necessary under this section for the State to prove the victim suffered “serious” bodily injury. Mere “bodily injury” is sufficient so long as it was caused with “other means likely to produce death or serious bodily harm.”
Jackson, 594 So.2d at 24. Therefore, the determination whether teeth could be considered a “deadly weapon” is not essential to prove the elements of aggravated assault.
¶ 41. In the present case, Dr. Angel, the plastic surgeon who operated on Kill-ingsworth, testified that Killingsworth’s injury was a “sharp trauma.” Killingsworth required surgery and a one-day hospital stay. By clamping down on Killings-worth’s ear with his teeth, Shaw ripped a seven and one-half by one and one-half centimeter (or a 3 inch by one-half inch) piece of tissue from Killingsworth’s ear. The photos of Killingsworth’s mangled ear were identified and placed into evidence.
¶ 42. Thus, we find that the jury could reasonably determine that Shaw’s use of teeth was sufficient to cause “serious bodily harm” to Killingsworth, thereby satisfying that element of section 97-3-7(2)(b).
VI. Whether the trial court erred in denying Shaw the right to give “words of provocation” jury instructions.
¶ 43. Shaw argues that the trial court should have given Jury Instructions D-32 and D-33, which were “words of provocation” instructions. D-32 stated: “The Court instructs the jury for the Defendant, Brett Anthony Shaw, that an invitation to fight is no[t] sufficient provocation to assault or push or strike another person, even though one may have been the first to make a warlike demonstration and commence to take one’s upper clothing off.” Instruction D-33 said:
The Court instructs the jury for the Defendant, Brett Anthony Shaw, that acceptance of a challenge to fight and voluntar[il]y engaging in a fight because of the challenge, cannot be set up as justification for assaulting another person and is unlawful. And, further, the Court instructs the jury for Brett Shaw that even though you find that Brett Anthony Shaw used insulting words toward Shaun Killingsworth, yet those words, nor would any words, amount [to] such provocation as to deprive Brett Anthony Shaw of the right to self-defense.
*91 ¶ 44. The giving or refusal of a jury instruction is subject to the trial court’s discretion. Allen v. State, 111 So.3d 679, 684 (¶ 9) (Miss.Ct.App.2013) (citation omitted). If the instructions, when viewed as a whole, fairly announce the case law and “create no injustice,” then no reversible error will be found. Id.
¶45. Upon review, we find nothing in the evidence to support the giving of these instructions. The trial judge, in refusing the jury instructions at issue, noted that defense counsel provided no authority to support the giving of these instructions, nor can this Court find any. ■ While a defendant may produce evidence that a victim used provoking language to support a theory of self-defense, that is not applicable to the facts of this case. See Miss.Code Ann. § 99-17-19 (Rev.2007). Shaw was the one using words of provocation, not Killingsworth. Further, Killings-worth was not the one on trial for aggravated assault; Shaw was. Accordingly, we find that the refusal of the jury instructions by the trial judge was not an abuse of discretion.
VIL Whether cumulative errors warrant a reversal of Shaw’s conviction.
¶46. As we have found no individual errors, there can be no cumulative error that requires reversal of the judgment. See Lawrence v. State, 116 So.3d 156, 163 (¶ 37) (Miss.Ct.App.2012) (“[I]f there are no individual errors, there can be no cumulative error that warrants reversal.”) (citation omitted).
¶ 47. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, AGGRAVATED ASSAULT, AND SENTENCE OF TWENTY YEARS WITH TEN YEARS SUSPENDED, AND COUNT II, MALICIOUS MISCHIEF, AND SENTENCE OF FIVE YEARS, WITH THE SENTENCES TO RUN CONCURRENTLY, FOLLOWED BY FIVE YEARS OF SUPERVISED PROBATION, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.
IRVING AND GRIFFIS, P.JJ., ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. CARLTON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY JAMES, J. ISHEE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., AND JAMES, J.

. Some issues have been consolidated on appeal for purposes of clarity.

. Shaw also asserts that the State attempted to bolster certain testimony merely by asking a witness to repeat an answer, but the defense failed to make a contemporaneous objection to the alleged misconduct.